## Caleb Van Husan v. John Kanouse and Others.

*Compound interest.* — The non-payment of an installment of interest when due does not convert it into principal, nor entitle the creditor, without an agreement of the parties, to collect interest upon it.

*Lien of mortgage discharged by tender.* — Where the mortgagee of lands, after the mortgage becomes due, and before foreclosure, tenders to the holder the whole amount due, which the latter refuses to receive, the lien of the mortgage is thereby discharged. — *Caruthers v. Humphrey,* 12 *Mich.,* 270.

And in case of an attempt to foreclose such mortgage afterwards, it is not necessary that the mortgagee should keep the tender good by a payment of the money into Court.

*The legal tender act.* — Congress had full power to pass the act making treasury notes a legal tender in payment of private debts.

*Heard May* 9. *Decided May* 13.

Appeal in Chancery from Washtenaw Circuit.

By the decree of the Court below, the bill of complaint was dismissed.

The facts are stated in the opinion.

*Wm. A. Moore,* for complainant:

In cases where it is expressly stipulated that interest shall be payable at certain fixed times, it has been held that interest may be charged on interest from the time appointed for its payment; that the same, in fact, becomes principal. — *Gibbs v. Chisolm,* 2 *N. & McC.,* 38; *Singleton v. Lewis,* 2 *Hill,* (*S. C.,*) 106, 408; *Doig v. Barkley,* 3 *Rich.,* (*S. C.,*) 125; *Pierce v. Rowe,* 1 *N.*

*H.*, 179; 1 *John. R.*, 137; *O'Neall v. Bookman*, 9 *Rich. L.*, 80; *O'Neall v. Sims*, 1 *Strobh.*, 115; *Eaton v. Bell*, 7 *Eng. C. L.*, 13; *De Bruhl v. Neuffer*, 1 *Strobh.*, 426; *Wright v. Eaves*, 10 *Rich. Eq.*, 582; *Farwell v. Sturdivant*, 37 *Me.*, 308; *Bainbridge & Co. v. Wilcocks*, *Bald. C. C.*, 541; *Camp v. Bates*, 11 *Conn. R.*, 488; *Mowry v. Bishop*, 5 *Paige*, 98; *Fobes v. Cantfield*, 3 *Ham.*, 17; *Pindall's Ex.'s v. Bank of Marietta*, 10 *Leigh*, 481, 484; *Pawling v. Pawling*, 4 *Yeates*, 220; *Cheek v. Waldrum*, 25 *Ala.*, 152.

Again: The interest, by the terms of the covenant, is made payable at the end of each year, and is as much demandable as if a specific sum equal to the amount of interest had been promised, and in default of payment, as much entitles the plaintiff to demand interest upon the amount so due and unpaid.

The fact that the amount so promised to be paid is described as *interest* accruing upon a larger sum, which is made payable at a future time, cannot the less entitle the plaintiff to demand interest upon the amount in default of payment, as a just remuneration in damages for the detention or non-payment. — *Talliaferro v. King*, 9 *Dana*, 331; *Pawling v. Pawling*, 4 *Yeates*, 220.

Interest on rents in arrear, ground rent, etc., is usually allowed, and these installments of interest are analagous. — *Naglee v. Ingersoll*, 7 *Penn.*, 185; *McQuesney v. Hiester*, 33 *Penn.*, 435; *Guthrie v. Stockton*, 5 *Harr.*, 123; *Elkin v. Moore*, 6 *B. Monroe*, 462.

Gold and silver coin constitute the only legal tender in the United States, and an act of Congress making treasury notes legal tender is unconstitutional and void.

Although a tender be sufficient, yet the defendant loses the benefit of the tender, unless he pay the money into Court at the time of filing his answer. — *Livingston v. Harrison*, 2 *E. D. Smith*, 197; *Freeman v. Fleming*, 5 *Iowa*, 460–3; *Mason v. Croom*, 24 *Geo.*, 211; *Brock*

VAN HUSAN *v.* KANOUSE.

*v. Jones*, 16 *Texas*, 461; *Clark v. Mullenix*, 11 *Ind.*, 532; *Jarboe v. McAtee*, 7 *B. Monroe*, 279; *Brown v. Ferguson*, 2 *Den.*, 196; *Cullen v. Green*, 5 *Harr.*, 17; *De Wolf v. Long*, 7 *Ill.*, 679; *Foote v. Palmer*, *Wright's R.*, 336; *Wing v. Hurlburt*, 15 *Vt.*, 607.

*Joslin & Blodgett*, for defendants:

An agreement to pay compound interest must be in writing, and it must be upon additional consideration. — 6 *John. Ch. R.*, 313; *Wilcox v. Howland*, 23 *Pick.*, 167; *Milliken v. Southgate*, 26 *Me.*, 424; *Dunbar v. Woodcock*, 10 *Leigh*, 628; *Pindall v. Bank of Marietta*, 10 *Leigh*, 481; *Childers v. Deane*, 4 *Rand.*, 406; *Mowry v. Bishop*, 5 *Paige*, 98; *Ferry v. Ferry*, 2 *Cush.*, 92.

The mode of computing interest on long bond is well settled. — See *Dean v. Williams*, 17 *Mass.*, 417; *Fay v. Bradley*, 1 *Pick.*, 194; *Doe v. Warren*, 7 *Greenlf.*, 48; *Story on Contracts*, §596, §1033.

The complainant's authorities on the computation are exceptions to the American rule, unless when the suit is for the interest, in which case some of the States have allowed interest upon the interest due.

CAMPBELL J.:

The bill in this case was filed to foreclose a mortgage, payable in three annual installments, with annual interest. The defence set up was a tender in treasury notes of the United States, declared to be a legal tender by act of Congress. The amount tendered was conceded to be sufficient, unless each installment of annual interest, as it became due, was turned into principal.

Some evidence was introduced for the purpose of showing an agreement to compound interest upon that basis, but we are satisfied no such agreement appears. The only questions, therefore, which we are called upon to decide are — first, whether the law implies any agreement to compound in the manner referred to; and, second,

whether the treasury notes offered are a legal tender in payment of private debts.

The authorities upon the subject of allowing annual or other periodical interest to be converted into principal were very fully referred to upon the argument. It was not disputed that the weight of authority is against any such legal implication, in the absence of an express agreement for such conversion; but it was claimed that there were legal analogies which would justify it. That there are many cases where the rule of damages is quite similar to the rule here contended for, we are very well assured; but, as remarked by Shaw Ch. J., (in *Ferry v. Ferry*, 2 *Cush. R.*, 92,) "it is a proposition to be taken with its well established qualifications, as well settled as the rule itself." The general understanding and practice in our Courts has followed the prevailing current of authority, in allowing no new principal to be struck upon securities, until the payments made exceed the amount of simple interest which has accrued, and upon which all moneys received will be first applied. The arguments based upon the change of public sentiment concerning usury laws, cannot be considered by a judicial body. Our legislation has gone far in modifying the ancient system. But we cannot properly allow our individual sentiments to keep us either behind or before the legislative action on this subject. As the law stands, we do not regard it as sanctioning any implication that interest may become principal without a clear agreement. We are not called upon in the present case to decide when or how such an agreement is to be made, in order that Courts may enforce it. We think the amount tendered was sufficient; and if made in a proper medium, such a tender discharged the lien of the mortgage entirely, so that no bill could be filed to enforce it; and, therefore, it became immaterial whether the tender was kept good or not. That question could only become important in

VAN HUSAN *v.* KANOUSE.

an action at law upon the debt. This rule was settled in *Caruthers v. Humphrey*, 12 *Mich. R.*, 270.

We are, therefore, called upon to determine whether the law making the treasury notes in question a legal tender in payment of debts is within the constitutional power of Congress.

This question having been answered in the affirmative by most of those Courts which have been required to decide it, (including, among others, the Court of Appeals of New York,) we should not deem it necessary to re-consider it, were it not a question of public importance, affecting the public credit and general welfare of the United States. The point being insisted on upon the argument, we can only perform our duty by indicating our opinion, and the ground of it, as briefly as the nature of the case will permit.

The reasons for doubting the validity of the law under which this paper was issued, are found in a denial of power in Congress to authorize the emission of any bills of credit at all, and the denial of the right to make anything a legal tender but gold and silver. The power to issue bills of credit has not been expressly given, and it is claimed such power should be expressed. It is also urged the power was designedly denied, upon full delib-eration, by the convention which framed the constitution. These reasons are asserted as precluding any well-founded doubt upon the issue.

We do not deem it necessary to examine the question of express power. It certainly is not to be found in the constitution. We are only concerned to see whether, in the absence of any prohibition, the power is or is not fairly deducible from those provisions which declare the duties and authority designed to be vested in the general Government.

Reference has been frequently made, in the discussions on this subject, to the fact that the draft of the consti-

tution contained a clause authorizing Congress "*to borrow money and emit bills on the credit of the United States,*" and that the words "*and emit bills*" were stricken out. From an examination of the very meagre sketch of the debate on the motion to strike it out, it is evident that members did not agree concerning the effect of such action. Some regarded it as amounting to prohibition; some as leaving the power by implication, unless directly prohibited. It is evident that some desired to leave it out, so that it might not be suggested to Congress as a power to be exercised on ordinary occasions. Out of the many members of the convention, very few are re-corded as having hinted at their views. Such action, if made public, would throw no light whatever upon the real design of the convention. But Courts are not at liberty to draw light from the secret debates of any legislative assembly. The intention of the convention, if it could be got at, is not so important as that of the people, who ratified the constitution. They acted upon the written instrument, in the light of passing events, and their intention must be derived from a fair inter-pretation of its contents. We have no evidence that the giving or withholding the power to issue bills of credit formed any part of the questions publicly discussed before the people. The "Federalist" is silent upon the subject, while it speaks very plainly of the propriety of forbidding the emission of bills, or the interference with currency, by the separate States. There is no reason to believe that the matter was called to the public attention. The con-stitution was thoroughly discussed, and accepted as a scheme chiefly designed to remove from the conflicting interests and action of the several States such matters as could not be safely left to local authority; and to give to the Union power to enforce such measures as were of general concern, so as to make their operation uniform throughout the whole country. Those matters

which it commits to the care of the Union are referred to in the most general terms, as was necessary where men had not the power to see into' futurity, and anticipate all the new means and inventions which might become desirable to carry out public plans, or the changed circumstances which might create new necessities. It has always been held by the Courts that, while the power of Congress is not to extend beyond the subjects designated by the constitution, yet, where given at all, it is complete and comprehensive.

The power to borrow money is a power which would have existed without any express grant of authority; and the only occasion for expressing it seems to have been to more effectually secure it from the hostile legislation of the States, and prevent them from destroying or injuring the public credit, by imposing burdensome taxes upon the Government securities. — *Story on the Constitution*, §1051; *Weston v. City Council of Charleston*, 2 *Pet. R.*, 449. That the Government may issue securities is not only expressed in the constitution, but is a natural inference from the power to contract debts. And to lay down a rule that Congress may issue one kind of evidence of indebtedness, but may not prefer and resort to another, is to assume a distinction which is nowhere to be found in the constitution. Unless that instrument limits them in their choice, it remains unlimited. Their discretion must be exercised according to their own views of propriety. No other department of Government has a right to criticise or restrain it.

The fact that the constitution has restrained the States from issuing bills of credit, and has not prohibited Congress from doing so, might, of itself, be conclusive, in a case of doubt, as showing that the subject had not escaped attention. It is very well known that difficulties had arisen in regard to State bills of credit, different from any that attached to Government paper generally. The

legal tender bills of one State were more depreciated than those of another, and much discord arose from the differences. The necessities and low credit of the Confederation were largely due. to its want of any of the powers of a Government. Its issues were all made by the authority of the States, which failed to enable it to protect them. And it may very fairly be presumed that, while single States might be easily led into acts of doubtful financial policy, it can hardly have been supposed possible that a Government representing the whole country would resort to extensive borrowing, on small negotiable securities, except upon some uncommon emergency. That such emergencies might arise, was foreseen in the convention, as the debates show; and, had it been deemed proper to tie up the hands of the new Government, it is not reasonable to believe that it would not have been done expressly. But, be this as it may, we are unable to find anything in the constitution which will justify us in saying that Congress may issue one class of securities, but cannot issue another.

The practical construction of the constitution has been in accordance with these views. Treasury notes have been resorted to on many occasions, when the ordinary resources of the Government have not been adequate to the emergency. During the war of 1812, they were issued very extensively, and made a legal tender in payment of dues to the Government. In *Thorndike v. The United States*, 2 *Mason's R.*, 1, Judge Story sustained a plea of such a tender. The practice has been so uniform and so continuous, that it might be fairly considered, in a case of more doubt than we conceive this to be, upon the question of construction.

We are satisfied that the United States are not prohibited from issuing bills of credit. Whether they can be made a legal tender, depends upon other principles. It has been held by the Supreme Court of the United

States that a note need not be a legal tender in order to come within the denomination of a bill of credit.— *Craig v. Missouri*, 4 *Pet.*, 447. It has also been held that even a State may contract that negotiable paper —not being bills of credit—shall be a legal tender in payment of debts due to the State.—*Woodruff v. Trapnall*, 10 *How. R.*, 190. But a State cannot authorize debts to be so discharged, unless due to it in its own right.— *Paup v. Drew*, 10 *How. R.*, 218 ; *Trigg v. Drew*, 10 *How. R.*, 224.

The present rebellion is the first occasion when it has been deemed necessary to make the treasury notes of the United States a legal tender in payment of debts due to private persons. The increased exigencies of business, enlarged and changed by the war, have required, in the opinion of Congress, a larger amount of currency of uniform value than could be obtained in specie, or was attainable safely in private or corporation bills. And it was suggested, on the argument, on behalf of complainant, that the justification of the legality of such paper has been rested upon the necessities of war, and cannot be maintained upon that basis.

There are many things, no doubt, which can only be done, either by Congress or the executive departments, during war, or with a view to it, simply because they have no relation or fitness to any other state of things. The powers are not new powers created by the war, but are existing powers called into exercise by it. There are other powers which may be exercised whenever a necessity is supposed to exist, while such necessity is rarely created except by war. If Congress has power to make these notes a legal tender, the power must be exercised in the discretion of Congress. It has so happened that the largest emissions of Government paper have been made during war. But we do not understand that the existence or non-existence of war can

have any bearing upon the legality of this paper. If the power exists to issue it, the necessity must be determined by Congress, and no Court can revise their action. They are chosen to provide for the public necessities, according to their own good judgment. If they act within the constitution, their policy is the policy of the nation, and their laws are the laws of the land.

In seeking to determine what powers are vested in the United States concerning the regulation of what shall be a legal tender, we must consider the necessity of any system of legal tenders at all, and how, if at all, it arises. It has generally been supposed that Congress could make some things, at least, available to that end. That there is no express power in Congress to declare anything a legal tender, is evident. That the constitution does not directly declare anything a legal tender is equally plain, and it can hardly be maintained that anything is made such by implication. As it has been sometimes claimed that the constitution expressly makes gold and silver coin a legal tender, it will be proper to quote all that is said on the subject. The only reference to gold and silver coin is in the shape of a prohibition on the States. "No States shall * * coin money, emit bills of credit, or make anything but gold and silver coin a tender in payment of debts," etc.

This is not an enabling clause. The States are prevented by it from creating either metal or paper money, and if they establish tender laws, it must be for coin, the value of which is regulated by Congress. The prohibition, as we learn from contemporaneous authority, was aimed as much at laws which enabled debtors to satisfy their creditors by property at an appraisal, as at any other abuse. The prohibition against coinage and bills would otherwise have been sufficient. — 3 *Story on the Constitution,* §1365; 3 *Elliot's Debates,* 144; *Sturges v. Crownin-*

*shield*, 4 *Wheaton's R.*, 122. This clause does not oblige the States to pass tender laws. Nor does it authorize or recognize any authority to pass such laws to govern all cases. There are many commercial matters beyond the control of States. And, with the control over certain classes of contracts and undertakings placed in Congress, it is evident that no tender laws passed by any State could govern in any matter which was not itself governed and sanctioned by State laws.

Without the protection of tender laws, there could be no safety in the transaction of business. Parties could never know how to fulfill their engagements, or to secure their rights. Even the most barbarous people have some standard of value which all persons can rely on. If a person is offered that which is a legal tender, he is obliged to accept it, or lose any cause of action for further detention of his debt, so long as the tender is kept good. If he holds securities, his refusal to accept the tender discharges them, and leaves his claim thereafter unsecured.— *Caruthers v. Humphrey*, 12 *Mich. R.*, 270. And in some places such a tender destroys any right of action whatever. But no man is bound to accept what he has not expressly agreed to, unless some law compels him to do so. And if he is away from the place of the original transaction, there must be often insuperable obstacles to justice, in the absence of such legislation. But it is needless to enlarge on this subject, as no one has been so unreasonable as to claim that a country could exist, as a civilized nation, without a power somewhere to declare what shall be a legal tender for the discharge of obligations.

Under the constitution of the United States, all possible powers must be found in the Union or the States, or else they remain among those reserved rights which the people have retained, as not essential to be vested in any Government. That which is forbidden to the States is

not necessarily in the Union, because it may be among the reserved powers. But if that which is essential to Government is prohibited to one, it must of necessity be found in the other; and the prohibition, in such a case, on the one side is equivalent to a grant on the other.

That there are necessities for tender laws in a multitude of cases over which the States would have no control, even could they coin money, is obvious. The power to regulate these must rest in the United States. If the constitution has placed bounds upon it, those bounds must be respected. If it has not done so, no Court has the right to limit what the people have seen fit to leave at large.

If there is anything expressed in the constitution upon the subject of a legal tender, it is the clause declaring that Congress shall have power " to coin money, regulate the value thereof and of foreign coins." And it has been asserted that when the value of coin is fixed it becomes thereby a legal tender, and the constitution leaves no further option to Congress. This clause contains no reference to gold or silver; and even if the phrase to " coin money" is to be confined to its literal sense of coining specie, it cannot be pretended that a prohibition on the States, relating to all but two specified metals, is to be made a limitation on Congress also. Congress, both before and since the constitution was adopted, has coined other metals, and this clause certainly confines them to no choice. But the argument confining a legal currency to some kind of metal will still hold good, if, as claimed, the power to regulate the value is another phrase for declaring the coin a legal tender. If, on the other hand, the power to create a legal tender is a distinct one, then there is no more reason for confining it to the coin of the United States, than to any other instrument of currency which may be adopted.

VAN HUSAN v. KANOUSE.

Upon this question we have means of decision which are beyond controversy. The Congress of the Confederation were expressly authorized to regulate the value of coin struck by their own authority, *or by that of the respective States.* It was never claimed that they could establish a legal tender. They could not control any class of commerce, and were without any legislative power whatever on this head. The States could not, without a violation of justice, make a legal tender which should fix a different value to their coins; but, had they chosen to do so, there would have been no remedy. It is notorious that they established the paper money of themselves and of the Confederation as a legal tender, and not always at the same rates. But there are other equally plain considerations. There is no country issuing coins of different metals, which does not fix the value of every coin issued, positively or relatively. The various silver coins have a proportionate value to each other, and the gold coins have a value measured by the silver as well as the gold standard. But it is not usual to. allow a legal tender, to any indefinite amount, to be made of silver or gold indiscriminately. Some countries adopt a silver standard, and some a gold one; and large payments need not be accepted unless made in the preferred metals. This country has not been an exception. We have made nothing but gold a legal tender indefinitely. Silver and copper have been allowed for small amounts, varying at different times. Discrimination has been made between the larger and smaller coins of the same metal. Foreign coin has been sometimes a tender, and sometimes not. The tender has sometimes been allowed by tale, and sometimes by weight. To compel the acceptance of any kind of coin in any amount, as a necessary inference from a Congressional declaration of value, would create as great a disturbance in the laws of trade as the establishment of any other

arbitrary standard. We cannot conceive that the power to regulate the value of coin makes that coin of necessity a legal tender at the value so fixed. It would be contrary to all usage, and would lead to absurd consequences. It is contrary to the experience of the Confederation, which was replaced by the Union. And we have the decision of the United States Supreme Court, in *Craig v. Missouri*, before cited, recognizing the enactment of tender laws as having no necessary identity with laws concerning money. We have failed to find any decision or plausible reason for confounding them.

But, while establishing the value of currency does not make it a legal tender, and does not necessarily confine tenders to that any more than to any other commercial article; yet it may be fairly claimed that there should at least be made a standard of value, by which the currency should all be measured. But the relations of various coins to each other have always been more or less arbitrarily fixed. The relative values of silver and gold, as commodities, may fluctuate as they will without affecting the legal value of coin. The standard of purity has several times been changed. The standard of value of coins has by no means been made to correspond to their intrinsic value. All that can be required of Congress is, that the currency shall be uniform throughout the country; and then, whether it shall be depreciated or kept up to the highest standard must depend upon their own views of official duty. Whatever they lawfully determine to issue, they are unquestionably bound in justice to protect uniformly; and the power to issue a currency, and make it receivable at all by others than the Government, embraces the right and duty to place all persons on the same footing; for otherwise the power would be nugatory. The constitution clearly designed to take all questions of currency, whether paper or metal, from the hands of the several States; and we think it

is in the discretion of Congress to make of its tokens, whether of one substance or another, tenders, in such amounts, or for such purposes, as may be determined upon. And the practical construction has always recognized in Congress the authority to make general tender laws concerning specie at least.

It is very probable, as has been claimed, that the framers of the constitution did not anticipate that money would be made current, except in specie. But they had before them examples of a different practice, which they only saw fit to reprobate as resorted to by the several States. It had been deemed necessary by Congress, during the Confederation, to issue paper money, far in excess of any amount of specie which had then, or has since, been in the country. Very many men then thought, and now think, that the Revolution must have failed without it. The constitution placing the whole war power in the United States, and allowing the Government to raise its own revenue directly, the States could rarely thereafter have occasion to raise money, except for State purposes; and the prohibition against bills of credit could under no circumstances cramp them, to the general damage, while the power to issue such paper could hardly fail to create strife between them. The reasons urged by the statesmen of those days, in their public discussions of the constitution, were all aimed at the danger of allowing this power to the States. But the absence of any prohibition on the general Government, under these circumstances, is a very strong argument in favor of a design to leave it unembarrassed. As before intimated, however, we must look to the instrument itself; and we there find the office of the Union, in controlling the financial interests of the country, so plainly established that the exclusion of the means now adopted cannot be admitted, without an arbitrary insertion of limitations not to be found presented there.

Whether the action of Congress has been wise or unwise, is a matter between them and their constituents. They have resorted to a plan which, if it causes sacrifices, has a tendency to equalize them. Whether the sacrifice could have been safely avoided, is a question which, if capable of any absolute and certain solution, can probably be answered more easily hereafter than now; and how it is to be answered, in no way concerns any judicial body.

We think the tender was lawful, and that the bill was properly dismissed. The decree must be affirmed, with costs.

The other Justices concurred.