[Filed June 17, 1886.]

### BEN HOLLADAY v. JOSEPH HOLLADAY ET AL.

USURY—CONVEYANCE TO DELAY OR DEFRAUD CREDITORS.—The evidence reviewed and held not to establish usury, nor that the conveyances from the respondent to the appellant were made to delay or defraud creditors.

MORTGAGEE IN POSSESSION.—The facts and circumstances considered, and the mortgagee in possession held not entitled to special compensation for his care in the management of the mortgaged estate.

SAME—PLEDGEE—SALE OF PLEDGE—TRUSTEE.—Where a mortgagee who is in possession of the real estate mortgaged, and also of a large amount of stock of various corporations, and other personal property pledged to him to secure his debt, and is also the assignee from his debtor of shares in a corporation which have been pledged to secure another liability of the debtor, suffers said shares to be sold, and afterwards purchases them on his own credit, but subsequently pays therefor with money derived from the debtor's estate, he thereby becomes a trustee of such stock for the debtor, subject to the payment of the debt.

TENDER—WRITTEN OFFER TO PAY—PAYMENT INTO COURT.—The statute providing for a written offer to pay money in lieu of a tender is intended simply to dispense with the necessity of actually producing and offering the money, but does not relieve a party from the duty of actually having the money in fact, nor from bringing it into court when the suit is begun, in order to keep his tender good. WALDO, C. J., dissenting.

MULTNMAH COUNTY. Defendant Joseph Holladay appeals. Decree modified in accordance with opinion.

*Thomas N. Strong* and *Richard Williams*, for Appellant.

*C. B. Bellinger* and *H. Y. Thompson*, for Respondent.

*John M. Gearin, District Attorney,* and *George H. Williams,* claiming a forfeiture for usury.

THAYER, J. The respondent commenced a suit in the lower court against the appellant to have certain conveyances and assignments of real and personal property theretofore made to the latter declared to be mortgages as against the former, and to compel an accounting for the rents and profits thereof. The property conveyed is situated in different counties in the state, though mostly in the county of Multnomah. It consists of houses, lands, stock in various corporations, household furniture, choses in action, and a quantity of wines and liquors. It appears that the parties to the suit are brothers, each far advanced in life, and it would seem that until a short time before the suit was commenced, a strong fraternal feeling and affection existed between them, and that each reposed in the other unlimited confidence. The respondent has raised a family, has during a great portion of his life been actively engaged in financial enterprises of great magnitude, has acquired and lost large property interests, and been accustomed to luxurious habits of living: His gains and profits have been immense; and his generosity and liberality bordered upon profligacy and recklessness. The appellant is a bachelor. He has confined his financial operations to a limited business, and pursued a cautious and frugal course; and while his brother has been endeavoring by shifts, devices, and speculations to make a great fortune, he has by prudence and economy succeeded in saving a very good competency. The career of the one has alternated between munificence and distress, and that of the other been attended by gradual and constant thrift.

The respondent, for a great number of years, has been accustomed to borrow from the appellant, from time to

time, sums of money, and to call upon him to pay money
for his use and benefit. During the said times, the ap-
pellant was residing in San Francisco. It appears that
some time prior to the first day of November, 1876, the
respondent came to Oregon and commenced financial
operations in this state, and acquired the interests in
the properties so conveyed to the appellant; that on said
first day of November, 1876, the appellant held two
promissory notes against the respondent, one of them
for one hundred thousand dollars and interest, and the
other for four thousand five hundred dollars and interest;
the one-hundred-thousand-dollar note bore date January
1, 1873, and the four-thousand-five-hundred-dollar note
bore date August 21, 1875; the rate of interest on each
was one per cent per month; that said appellant was at
Portland, Oregon, on said first day of November, 1876;
but I should judge from the evidence that he was there
only temporarily, probably on business; that he then
proposed that the respondent make him a new note,
which was readily assented to by the latter, who there-
upon executed to the appellant a promissory note for
$163,345, at the same rate of interest, which ostensibly
was given to cover the other two notes, and interest ac-
crued thereon. Long prior to the execution of this last
note the respondent had signed a deed, by the terms of
which he conveyed the part of the property in question,
known as the residence property, to the appellant, but it
was not delivered until May, 1876. Nothing seems to
have been said about the matter; nor was the object
or purpose indicated. The property was valuable, and
seems to have been held ever since by the respondent,
and to have been regarded by him as his Oregon resi-
dence. In 1875 the respondent conveyed and caused to
be conveyed to the appellant the property known as the
seaside residence, situated in Clatsop County. The ap-

pellant was residing at San Francisco at the time, and was not informed until afterwards that these conveyances had been made to him. The property last referred to consists of a hotel and grounds, constituting a fashionable summer resort. The other property in controversy was conveyed subsequent to the giving the note last referred to.

It appears that some time about the 1st of November, 1877, there was something said between the parties about the property. The respondent at that time was about to leave the state, to be gone an indefinite time, and the appellant had become anxious about his debt. He says he went to the respondent about the property, and told him that he wanted his money; that the respondent did not have it, but that he told him, appellant, the property was his—"that no power on earth could take it from me; that it was my property." This testimony does not seem to have been controverted, and I have no doubt but that it is true. The respondent left the state at that time, and did not return until a short time before the suit was commenced, which was in the latter part of 1883. It appears further that the appellant, at the time of the execution of the last note, was contemplating going back to San Francisco, and was urged by the respondent to remain, and that he did so, and has managed the property, and all the various complications connected with it, prudently and skillfully; that he perfected titles to parts of it; conducted the business to which other portions of it were devoted successfully, and has preserved it almost in its entirety. He has, besides, paid from the proceeds of the businesses a large sum of general indebtedness against the respondent, a large sum charged upon the property, and furnished to the respondent, for his own private use, about one hundred and twenty thousand dollars. The evidence shows

that no estate in the hands of a bailiff was ever better managed or preserved.   Even the wines and liquors left at the residence were almost untouched.   Out of a six-thousand-dollar stock of those articles of beverage, it was conceded upon the argument that the appellant had used only a hundred dollars' worth during the six years they were in his custody.   The amount of cash drawn for his private use during all that time was $6,138.74.

There are many other incidental facts in the case that have been litigated earnestly, but it will not be necessary to make a detailed statement of them, or express any particular view as to their effect.   The appellant filed an answer to the complaint.   After it had been amended some five times, and upon the issues so raised, a large amount of testimony was taken.   A hearing of the case was had before said Circuit Court, and the decree from which the appeal is brought was given thereon.

No one can take a retrospective view of this affair without concluding that a great deal of useless controversy has been had, and bitterness indulged in.   The relationship of the parties seems to have been overlooked. The fact that the same blood courses through the veins of each, and that they were both nursed at the same breast, seems not to have been considered with that reverence which ties so sacred should inspire.   Besides, for years and years they had been upon the most intimate and friendly terms, manifesting an intensity of feeling for each other that no relationship between man and man save that of consanguinity will incite.   On the 20th and 28th of September, 1883, the respondent telegraphed the appellant of his intended departure for Oregon, and directed him to get the house ready to receive him and his family.   The latter promptly responded to the demand, and the former duly arrived, and was cordially received, but for some cause or other they failed to

adjust their affairs, and the suit was begun. They engaged in a limited correspondence by letter prior to the commencement of the suit, although they were both living under the same roof, and this terminated by a written offer upon the part of the respondent to pay the appellant $275,200, principal and interest, upon the said promissory note for $163,345, designated in the offer as $160,000; and as bearing date about from the 1st to the 14th of November, 1877, and a demand for a redelivery to the respondent of the stocks, choses in action, and other personal property transferred, and of a reconveyance of the real property conveyed, and for an accounting of the rents, issues, and profits of the property, and of all the property disposed of by the appellant. The offer was refused, and a resort had to the courts for a settlement.

There would have been less objection to such a course if the issues had been confined to the real matters in difference; but the appellant, instead of exhibiting an account, and having a speedy and final settlement of the affair, interposed several defenses that have consumed a large portion of time and amount of expense to dispose of.

The defense that the property was conveyed absolutely to the appellant has not been sustained, and was virtually abandoned upon the argument. It does not appear, it is true, that there was any understanding between the parties at the time of the conveyances that they were made for the purpose of securing the indebtedness; but the whole transaction clearly indicated it, and the respondent evidently expected that the appellant would take charge and manage the property and the business connected therewith.

The other attempted defense, that the transfer was made with intent to hinder, delay, or defraud creditors, also entirely failed of proof. There is nothing shown

that it tended to have that effect.  A vague suspicion might arise that the respondent was apprehensive that an attempt would be made by his crèditors to lay hold of this property, but there is no proof that such was the fact.  His indebtedness to the appellant was a sufficient justification for the conveyances, especially as he expected the appellant to take the charge and management of the property.  He trusted to his brother to do what was right, and no doubt was entirely confident that he would do so.  Nor do I believe that the latter viewed the matter in any other light, or intended to claim the absolute ownership of the property.  He is quite an old man, and probably inclined to be churlish, and it is very likely that the whole difficulty has arisen out of some supposed affront.

Another feature in the case has served to complicate it considerably.  The district attorney of the district in which the suit is pending seems to think that there was usury in the transaction between the parties regarding the execution and acceptance of the note of November 1, 1876, and has attempted to intervene in behalf of the state, and have the debt forfeited to the school fund.  There is no provision of the statute which permits such intervention, and I can discover no principle upon which the right can be claimed.  The statute provides that if it shall be ascertained in any suit brought on any contract that a rate of interest has been contracted for greater than is authorized, etc., the design of which is to obtain for money so loaned a greater amount than that allowed by the statute, the same shall be deemed usurious, and shall work a forfeiture of the entire debt so contracted to the school fund of the county where such suit is brought; and that the court shall render a judgment for the amount of the original sum loaned, etc., without interest, against the defendant, and in favor of the state of Oregon for the

use of the common-school fund, etc. (Miscellaneous Laws, c. 3, sec. 27.) It is not unusual in statutes against usury to inhibit a recovery of the debt, but this provision enforces payment of the principal sum, and requires that the court adjudge it to be paid to the state. It does not permit the defendant, in case usury is established upon a trial, "to go hence without day," but compels him to pay the principal of the debt, though it relieves him from the payment of the interest; but it seems to me that the right to plead usury is still a personal privilege, and that no other party can interpose such plea.

The statute makes it the duty of district attorneys to prosecute for all penalties and forfeitures to the state which may be incurred in any county in their districts, and for which no other mode of prosecution and collection is expressly provided by statute. (Civil Code, sec. 945.) But it has to be by action at law. (Civil Code, sec. 342.) If the district attorney has the right to intervene in such cases, as he has done in this case, it then becomes his duty in all cases where money has been loaned and its payment sought to be enforced by action or suit, to make diligent inquiry in order to ascertain whether or not he ought to intervene, and that duty alone, in a commercial town like Portland, would keep him constantly and actively employed, and interfere so much with the enforcement of payment of debts as to become a serious annoyance. I do not think the provision referred to contemplates any such thing. Nor, in my opinion, is this the character of suit in which the remedy mentioned can be applied. It is in the nature of a bill to redeem, and the court has only to ascertain the amount the respondent should pay the appellant, in order to compel him to reconvey.

Besides, I do not think there is any evidence upon which the court could find that a rate of interest has

been contracted for greater than is authorized by statute. The only evidence of the claim is, that the amount of principal and interest upon the $100,000 note and the $4,500 note did not, on the first day of November, 1876, aggregate the sum of $163,345; that it only amounted to $151,145, and that the appellant testified that it was given for those two amounts.  It might, perhaps, be inferred from the fact that the appellant had charged a usurious rate of interest upon the debt; but that would be very unsatisfactory proof upon which to determine the question.  The discrepancy might have arisen by mistake in the computation, or there might have been other valuable considerations included in the account. From the time the last note was given until the appellant was called as a witness to testify upon the subject, some seven years had intervened, and it is not to be expected that he would remember the particular circumstances of the affair.  In his first examination, his attention was not called to the discrepancy.  If it had been, the presumption is that he would have explained it the same as he subsequently did; but there was no occasion for particularity when he first testified.  The note was admitted by the pleadings, and the whole drift of the first examination was to ascertain what the terms and conditions were upon which the conveyances were executed.  The appellant's testimony as to the last note being given for the payment of sums of money advanced to the respondent's son and wife, and the bar bill, as well as the amount of the two notes, is not improbable.  The respondent may not have owed him on account of any such advancements of money, but if the appellant honestly supposed he did, and submitted an account of it to the respondent's secretary, and he included the amount in the last note, it would rebut any presumption of a design to obtain an unlawful rate of interest.  Again, in

all the dealings between the parties there is no intention shown by the evidence, upon the part of the appellant, to exact interest beyond the rate charged in the note, which, at that time, could lawfully be exacted in Oregon.   Before a forfeiture, in such a case, can be claimed, a design, upon the part of the lender must be shown to obtain for the use of the money a greater amount than that allowed by law, and that has not been proved in this case, in my judgment.   I think, on the contrary, that the evidence disproves it.   This going back six or seven years to prove that the maker of the note has contracted to pay an illegal rate of interest when he knows nothing about it, nor any other party except the payee, and he testifies that no such agreement was ever made, directly or indirectly, and then require a court, in view of the facts, to find that usury was contracted for, overtaxes credulity. The appellant's testimony may not satisfactorily establish the negative proposition, but that does not strengthen the affirmative.   It may be said that the respondent also testified that there was no consideration for the last note, except the amount of the two notes, and he may be entirely honest in his belief upon the subject, but he evidently knows nothing about it—did not at the time when the note was presented to him for his signature by his secretary; thought it was all right, and he signed it, and according to the theory of the state's attorney, never knew that he had been outrageously cheated, until strangers to the transaction informed him, six or seven years afterwards.   The effect of such a practice as the one invoked in this case would be to place parties to commercial transactions under the guardianship of the state.

It was said upon the argument that the state had an interest in the affair; so far as preserving a good, wholesome public policy, and the enforcement of its laws, it doubtless has, but it certainly has no property right or

pecuniary interest in this debt until a decree is rendered in its favor, for a recovery of it, any more than "the poor children of Portland" have, whom it represents in the matter. When a plea of usury is established in a suit or proceeding, the court having cognizance of the matter gives judgment in favor of the state, against the party guilty of exacting it, for the principal sum, and thereupon the state becomes an interested party, and not, in my opinion, before. Any other theory would lead to constant perplexity and embarrassment. Every time a debt was sought to be collected by process of law, the plaintiff would be liable to have to engage in a controversy with the state as to whether or not usury had entered into the transaction; and it would occasion an intolerable nuisance. I do not believe such a practice ought to be permitted.

Some controversy has arisen in regard to the accounting. It is claimed that the appellent should be charged for the rent of the residence during the time the respondent has been absent, and witnesses were called to show its rental value. This charge is allowed against the appellant.

The appellant should not be charged for the hundred dollars' worth of wines and liquors consumed by him. A person who has husbanded that amount of wines and liquors so faithfully as that should not be compelled to pay for the small portion used.

Another item sought to be charged to the appellant is the Smith notes and mortgage, which were turned over to him with the other property. They amounted to some eight or nine thousand dollars principal, and the interest accrued thereon. The appellant assigned them to his attorney, Thomas N. Strong, to secure him and his brother for legal services rendered by them as attorneys for him in litigation growing out of the property con-

veyed. Subsequently the assignee commenced proceedings to foreclose this mortgage. A defense was interposed, consisting of alleged partial payments, and finally a settlement of the matter was effected by the Strongs accepting the conveyance of certain portions of the property mortgaged. After this settlement the appellant and the Strongs agreed that the latter should take this property in full for their said services, which at the time amounted to $18,774. They claim, however, that the amount received was not more than sixteen thousand dollars. The only important question is whether the services rendered by the Strongs should be charged to the respondent. The court has concluded to allow it against the appellant.

It was claimed upon the part of the appellant that he should be allowed a compensation for his time and attention to the property while he had possession, and I believe that the services he rendered in taking care of and managing it, under the circumstances, would entitle him to a reasonable compensation therefor; and were it not for the fact that he is remunerated in having been able to keep so large a sum of money invested at a high rate of interest, and not subject to taxation, I should be in favor of allowing him such compensation; but the way the matter has been situated, he has been able to keep $163,345 upon interest at the rate of twelve per cent per annum, and had no taxes to pay upon it. The yearly interest thereon amounts to $19,601.40, which is about double what he could have realized under the ordinary mode of loaning; and besides, he has been furnished, I suppose, his ordinary living expenses.

It was also claimed that the appellant should be adjudged to be the absolute owner of the stock in the Oregon Real Estate Company. It appears from the proofs in the case, that prior to May 8, 1878, that stock, con-

sisting of 9,995 shares, had been pledged by the respondent to the Bank of California as a security for a debt of $22,318.96 owed by the respondent to said bank, and that on said eighth day of May, 1878, the respondent executed to the appellant a written assignment thereof, subject to such pledge. Subsequently the bank foreclosed the pledge, and sold the stocks, which were bid in by one Thomas Brown, and held in trust for said bank. Shortly afterwards the appellant negotiated the purchase of them from said Brown, and claims to have purchased them upon his own account. He raised the amount of the purchase-money by pledging his own credit, but repaid it again from the income of the property held by him under the aforesaid conveyances. The respondent claims that said transaction was had for his benefit, and that the appellant only holds the stocks as a security for the debt owing to him by the respondent. There is nothing in the evidence showing any understanding or intention upon the part of the appellant to purchase the stocks for the benefit of any one except himself; but occupyiug the relation he did to the respondent, and having paid for the stocks indirectly with the latter's effects, I think a trust arises in favor of the respondent, and that he should have the right to redeem from the appellant. The appellant, as said upon the argument, was more than a mortgagee in possession; he seems to have been a sort of bailiff, and equity will not permit him to speculate in the affairs of the estate.

Under the view I have taken of the case, the appellant is entitled to be paid his note of $163,345, and the interest thereon from its date, November 1, 1876, at the rate of twelve per cent per annum, less the $7,520, the amount received by him. It is claimed by the appellant's counsel that there should be a rebatement from said sum drawn out, of several hundred dollars; but it

is hardly worth while to consider that question, and I am inclined to allow the whole item. It is claimed upon the part of respondent that interest should stop upon the $163,345 note from the time of the said offer, made October 17, 1883, to pay $275,200; but the offer did not cover the amount then due, as I consider it, and I would hardly be willing to give it that effect if it did, unless the money had been brought in and deposited with the court at the time the suit was commenced.

We have a statute in the state which, if complied with, prevents the recovery of costs by the creditor, and allows the debtor to recover costs. It provides that "when in any action or suit for the recovery of money or damages only, the defendant shall allege in his answer that before the commencement thereof he tendered to the plaintiff a certain amount of money in full payment or satisfaction of the cause of action or suit, and now brings the same into court and deposits it with the clerk for the plaintiff, if such allegations of tender be found true, and the plaintiff do not recover a greater sum than the amount so tendered, he shall not recover costs of the defendant; but the defendant shall recover them off him." (Civil Code, sec. 551.) And we have another statute which provides that " an offer in writing to pay a particular sum of money, or to deliver a written instrument or specific personal property, is, if not accepted, equivalent to the actual production and tender of the money, instrument, or property." (Id., sec. 842.) I think it is intended by the former provision of the statute that in order to make the tender effectual, the money has to be brought into court and deposited with the clerk, and the latter provision simply dispenses with the necessity of actually producing and offering the money in the outset. It is a statute for convenience. It is a hardship to require a party who wants to pay off a debt or discharge an obli-

gation, and the amount is large, to make an actual offer of it, and the legislature has substituted another mode; but this does not dispense with the necessity of the parties having the money in fact, nor of his bringing it into court when the suit is begun, in order to keep his tender good. He would certainly have to do that to discharge the debt, or, under our statute, avoid the payment of costs, and I think it ought to be done in order to stop interest. The object of the law in requiring the actual production of the money was that the sight of it would tend to induce the party to whom it was offered to accept it, and thereby prevent litigation; and if the tender is required to be taken into court and deposited with the clerk, so that the party to whom it was offered could go at any time and get it, if he were to change his original determination, many a lawsuit would stop which otherwise would be fought out to the bitter end. A naked offer to pay a sum of money is often a poor earnest that it will be paid if accepted, and it should be shown to have been genuine, by bringing forward the money when the litigation is commenced, in order to exempt the party making it from the fulfillment of his obligation. It may be good as an offer to do equity without that, and enable the party to claim the relief sought, as the court can impose the terms upon which it is granted; but the legislature cannot be supposed to have intended to relieve a party from the payment of interest, where he is not relieved from the payment of costs. The decree should be in accordance with this opinion.

LORD, J. Nearly all the matters involved in this case are questions of fact. It was virtually conceded at the argument that the transaction out of which the suit arose was not an absolute sale, but more in the nature of a transfer of the property in trust as a security for the

payment of certain indebtedness admitted. In the result reached upon the facts I concur, and only add this explanation to say, that, being satisfied from all the facts and circumstances that the transaction was not usurious, I do not deem it necessary to express any opinion as to the mode in which the state intervened, or to give any construction to the usury statute. As the state intervened upon the evidence of the defendant given in the main suit, and that evidence, in my judgment, being insufficient to sustain any proceeding for forfeiture under the usury laws, it is immaterial whether the mode of procedure adopted by the state is correct or incorrect, or what might be the proper construction of the statute. In this particular, I shall therefore reserve my judgment.

WALDO, C. J., agreed with LORD, J., as to the matter of usury, and held also that the tender stopped the interest, and that it was not necessary, in a case like this, to keep the tender good by paying the money into court. (*Van Husen* v. *Kanouse*, 13 Mich. 303.)