Submitted on brief January 16, modified and affirmed January 30, 1917.

## SHORT *v.* ROGUE RIVER IRRIGATION CO.

### (162 Pac. 845.)

**Joint Adventures—Joint Contracts—Extension of Time.**

1. In joint contracts neither party can extend the time for performance without the consent of the other.

**Joint Adventures—Joint Vendors—Extension of Time.**

2. One joint vendor cannot extend time of performance without consent of other.

**Tender—Mode and Sufficiency—Pleading.**

3. A defendant relying on a plea of tender must show that he had at time of tender, and still has, the means of making the tender good.

[As to sufficiency and effect of tender, see notes in 77 Am. Dec. 470; 30 Am. St. Rep. 460.]

From Josephine: FRANK M. CALKINS, Judge.

In Banc.    Statement by MR. CHIEF JUSTICE McBRIDE.

This is a suit by Maggie E. Short and Charles E. Short against Rogue River Irrigation and Power Company, an Oregon corporation, W. B. Sherman, Chris-

topher Omann, R. E. Lee Steiner, J. G. Riggs, A. N. Parsons, Sam Baker, F. N. Derby, G. A. Knoblauch, F. A. Pierce and Charlotte Pierce, his wife, G. C. Farmer and C. E. Farmer, defendants, to quiet adverse claims to real property and to annul and cancel a certain selling contract made between the plaintiffs and the defendant Sherman.   The contract is set up in the complaint, and its essential provisions are as follows: The land included in the contract was the whole of section 20, township 35 south, range 6 west, Willamette Meridian, in Josephine County, with the exception of certain lots and tracts not necessary to be enumerated here.   By the terms of the agreement, Sherman was authorized to negotiate sales according to a schedule agreed upon by the parties until June 8, 1911.   He was within 15 days from the date of the contract to start an active campaign for the sale of the lands in lots and tracts, surveying, platting and advertising and selling the property at his own expense in such manner as to him might seem best.   The lands were to be sold by a schedule to be agreed upon by the parties as soon as the surveying should have been completed at a price to aggregate not less than $27,500, except by the written consent of the Shorts, upon the following terms: Ten per cent in cash to be paid by the purchaser upon the delivery of a contract of sale to be executed by the Shorts, the balance to be paid in monthly installments of not less than 3 per cent, and deferred payments to draw 6 per cent interest.   Sherman was to collect all money from such sales and place the same in a fund to be divided as follows: One half of the money received on each sale to be retained by Sherman as his commission until he had received the amount of 25 per cent of each sale; the remaining 75 per cent to be given to the Shorts in payment for the land sold.   The

fund, however, was to be kept intact until the Shorts should be satisfied that all expenditures incurred by Sherman for which they might be liable had been paid out of his commission, and until all indebtedness of the Shorts which might conflict with their ability to make a good conveyance of the land sold should have been paid out of the Shorts' portion of the fund. An accounting was to be made every 30 days. Then followed these clauses:

"Fifth. The first party agrees to sell the property at the price of $13,800 net to them on the following terms: At least $4,725 and interest at the rate of 7 per cent per annum shall be paid on or before August 1, 1910, and the balance to be paid from the proceeds of the sale as heretofore provided.

"Sixth. Said first party hereby agrees to issue good and sufficient warranty deeds to any lot or parcel of said land as the same may be paid for by the third party or upon the payment of 50 per cent of the purchase price as a mortgage given for the remainder.

"Seventh. It is expressly understood and agreed that if the party of the second part shall on or before June 8, 1911, pay to the party of the first part from the proceeds of the sale of said lots, parcels, or tracts of land $6,900 in cash and mortgages covering such property on which 50 per cent of the purchase price has been paid in an amount aggregating $13,800, as above provided, then and in that event the party of the first part shall promptly as they receive said sum convey all the remaining unsold lots, parcels, or tracts of land to the party of the second part, free and clear of all encumbrances of whatsoever name or nature, it being expressly understood and agreed that the total amount in cash or otherwise to be received by the party of the first part under and by virtue of this agreement is not to exceed the sum of $13,800.

"Eighth. The party of the second part expressly agrees that he will maintain an active selling campaign on said property during the life of this contract; that he will pay at least $4,725, with interest at seven per

cent from date hereof, by August 1, 1910, either from the proceeds of the sales, or otherwise, and should he fail to keep actively engaged in the sale of said land or to make the payment as above described, then, and in that event, he shall forfeit all his rights and interests in and to this contract, excepting as to his commissions for the sales already made; and no action at law is necessary to place the title to this property in the hands of the first party the same as before this contract was made.

"Ninth. It is further understood and agreed that nothing herein shall constitute or be considered as an agreement or obligation of any kind on the part of the party of the second part to purchase the above-described property, or any part thereof, nor to pay any amount thereon.

"Tenth. And the parties of the first part hereby agree by and with the party of the second part that they will sell to him all of the property herein designated and described upon his faithful performance of the conditions herein promised and upon the terms and conditions herein specified. Time is expressly declared to be the essence of each and every term, condition or covenant herein, and upon default in the observance of either term, condition or covenant, or the payment of any sum herein mentioned, the second party herein, his heirs and assigns, shall *ipso facto* forfeit all payments made hereunder and all rights acquired herein without notice from the first parties and any sums paid shall be retained and kept by the first parties as liquidated damages and rental for the use of said premises, and upon default the second party shall not be deemed to have acquired any rights in the property mentioned herein by virtue of any payments or things done or performed hereunder, and it shall not be necessary for the second party to begin proceedings at law or equity to determine any rights hereunder, the parties hereto by this instrument determining the rights of each hereunder, and upon the default of the second party in any of the foregoing matters the said forfeiture shall apply to all things contained herein except to commissions already earned."

The complaint alleged that on May 20, 1910, Sherman assigned the foregoing contract to the defendant Rogue River Irrigation & Power Company; that said company paid upon said contract the sum of $4,725 and interest to August 1, 1910; that neither said company nor any other person had made any other payments nor performed any of the stipulations of said contract required by them to be performed; that the other defendants claim some interest or lien upon said property, but if they have any, it is subordinate to the rights of plaintiffs. There was a prayer that the defendants be adjudged to have no interest or estate in the premises; that the title of plaintiffs be adjudged good and valid; that the defendants be enjoined from asserting any adverse claim to the property; that the agreement be canceled and annulled; that the Rogue River Irrigation & Power Company and Sherman be required to execute quitclaim deeds to the property; and for general equitable relief.

All the defendants except the power company and Sherman made default. The power company answered disclaiming any interest in the property and alleged:

"Because of the damage caused one W. B. Sherman, one of the defendants herein, by reason of the failure of the said Rogue River Irrigation & Power Company to fulfill the promises and agreements made with the said W. B. Sherman, and by reason of which the said W. B. Sherman entered into that written agreement and assignment referred to in the complaint as being recorded in volume 36 of the deed records of Josephine County, Oregon, at page 416 thereof, this defendant consented and agreed with the said W. B. Sherman that the said assignment was and should be canceled, annulled and held void, and the said W. B. Sherman restored to all of his original rights in and to and under the contract between him and the plaintiffs herein set forth in said complaint, and that he, the said W. B.

Sherman, should have and receive the benefit and the credit for all payments made upon the said contract with the plaintiffs by the said Rogue River Irrigation & Power Company, more especially those certain payments heretofore made of $4,725 principal and payment on the interest up to and including August 1, 1910.''

Then followed a general disclaimer.  Sherman, who is the sole appellant, answers with a qualified denial of the allegations of the complaint, and then alleges that immediately after the making of the agreement with the plaintiffs he entered upon and continuously thereafter maintained an active campaign for the sale of the lands by surveying, platting, advertising and endeavoring to sell said property, at large expense to himself, and that he had at all times since said date complied with all the requirements of the contract; that said efforts were continued until the twentieth day of May, 1910, when by a written agreement the contract was assigned by them to the Rogue River Irrigation & Power Company, which upon August 1, 1910, paid to plaintiffs $4,750 upon the purchase price and interest up to August 1, 1910, and that thereafter the said power company continued at great expense to itself to maintain an active campaign for the sale of said property and fully performed every term and condition of the contract between Sherman and the Shorts. The answer then sets forth the agreement between Sherman and the power company, which included the transfer by Sherman of other property and property rights of his own, and alleges that said transfer was procured by false representations and deceit on the part of the company; that said company wholly failed to comply with its part of the contract with defendant Sherman and fraudulently borrowed large sums of money upon the land in section 20 conveyed by Sher-

man to it to Sherman's damage in the sum of $6,000; that his assignment of the contract in suit should be canceled and declared void; that the power company after its dissolution, acting by and through its former officers and directors, agreed with defendant Sherman by reason of its nonperformance of the contract of assignment before set out he was entitled to be restored to his original position respecting said land and to have the benefit of any and all payments made by it upon said contract, with the plaintiffs, and that upon the discovery of the misrepresentations of the officers of the power company and their agreement to restore him to his original position, which agreement could not be formally entered into in writing because of the dissolution of said corporation, he immediately continued to maintain and prosecute an active campaign for the sale of said lands and performed all the conditions of said contract; that on June 7, 1911, defendant Sherman, in a letter addressed to and received by each of the plaintiffs, offered and tendered to plaintiffs the sum of $2,175 cash, together with any interest that might be due, and offered and tendered in conformity with said contract $6,900 secured by mortgages upon said land located in section 20, and said mortgages were delivered at the request of plaintiffs to their agent the Grants Pass Banking & Trust Company, with instructions to deliver them to plaintiffs when plaintiffs should execute warranty deeds conveying good title to the land. It was also alleged that there were encumbrances which rendered the title unmarketable, to wit, an unsatisfied mortgage on the land and another mortgage from F. A. Pierce and wife to G. A. Knoblauch for $1,100; that the title is further clouded by an agreement executed by F. A. Pierce to William Bowers and by a divorce suit between the plaintiffs in which Maggie E. Short claimed an equitable lien upon the

land; that plaintiffs have never tendered to defendant Sherman a deed conveying a good and marketable title; that defendant Sherman has always been ready and willing to pay the sums due under said contract, has left the mortgages tendered under said contract on deposit at the bank aforesaid as a continuing tender, and has always offered and now offers to pay the actual cash due on said contract after deducting the actual amount of the mortgages therefrom.

The new matter in the answer being put in issue by appropriate denials, there was a trial and findings for the plaintiffs and a decree substantially that, unless defendant Sherman should pay to the plaintiffs within 90 days the sum of $9,075 with interest at 7 per cent per annum from February 21, 1910, and the costs and disbursements of this suit, the defendant should be barred and foreclosed from all interest in the property, and that within 10 days from the expiration of said redemption period in default of such redemption said defendant should execute a quitclaim deed to plaintiffs of said premises. There was no personal judgment against the defendant. From this decree he appeals.

Submitted on brief under the proviso of Supreme Court Rule 18: 56 Or. 622 (117 Pac. xi).

MODIFIED AND AFFIRMED.

For appellant there was a brief over the names of *Mr. O. S. Blanchard* and *Mr. C. A. Sidler.*

For respondents there was a brief prepared by *Messrs. Durham & Richard.*

Opinion by MR. CHIEF JUSTICE McBRIDE.

In 1909, Charles E. Short, one of plaintiffs, obtained a written option from F. A. Pierce to purchase the

lands described in the complaint herein for $6,500, paying the sum of $25 down. Later he entered into an agreement with his then wife, the other plaintiff herein, that they would make the purchase together; she to advance $1,000 for his use in paying for the land. He paid the greater portion of this sum to Pierce and received from him a written contract of sale for the sum of $6,500, less the sum of $750 already paid, which contract was taken in the name of his wife, and a deed to her from Pierce was at the same time deposited in escrow subject to compliance with the conditions of the contract. As seen by the statement herein, the plaintiffs entered into a contract with defendant Sherman, the substance of which is given in the foregoing statement. In May of the same year, Sherman assigned this contract to the Rogue River Irrigation & Power Company, having previous to that time done little or nothing in the way of attempting to make sales of the property. On August 1, 1910, the power company paid the $4,725, with interest at 7 per cent, which was applied upon the debt due to Pierce, whereby Mrs. Short became the owner of the legal title. Subsequently there was a divorce suit between the Shorts, and in the decree in that case it was held that Mrs. Short was trustee for Charles E. Short of a half interest in the lands and in the contract of sale now in suit, subject to a lien in her favor against Short for $1,000, with interest at 6 per cent from March 1, 1909. The agreement between plaintiffs and defendant Sherman has a double aspect: (1) There is an agreement that he may sell so much of his land as could be sold by him prior to June 8, 1911, when his contract would expire by limitation; (2) there was an alternative option permitting him to purchase the land himself within the time specified by paying $6,900 in cash and

giving mortgages upon the various lots and parcels
for the remainder of the purchase price, payable in
installments with interest as provided in the contract.
It appears that the power company after the assign-
ment attempted to make, or did make, some sales, but
upon what terms it does not appear, and failed to put
the money if any were received into the funds provided
in the contract or to report to the plaintiffs or account
to them for any proceeds of the sales.  It would ap-
pear that they were attempting to deal with the plain-
tiffs rather under the option clause of the agreement
than under the selling clause, and there is some testi-
mony tending to show that Williams the promoter of
the company, induced Sherman by fraudulent repre-
sentations to enter into the organization and assign his
interest to the company.  At all events, the company
dissolved without complying with the terms of the
contract, and after such dissolution it appears that
there was some verbal agreement between Sherman
and the former officers of the corporation, of which
Sherman was a stockholder and director, that the con-
tract should be retransferred to Sherman together with
all payments made and rights arising by reason of
such payments.  It is contended by Sherman that he
also had a written assignment made later, which he
claims had been removed from his files; but this testi-
mony is contradicted by his own answer, which states
that it was impossible to make a written assignment
by reason of the dissolution of the corporation.  So it
is doubtful to say the least whether he derives any
rights whatever by reason of any informal negotiations
between himself and the officers of the defunct corpora-
tion, none of whom testified upon this subject.  The
date of the alleged oral transfer is not given, and
whether it was before or after June 8, 1911, is uncer-

tain from the testimony. As defendant could have made it certain, it is only fair to assume that it was subsequent to June 8th.

1–3. Along early in June, probably about the 1st, Sherman asked Mrs. Short for an extension of time; at least, the matter was broached between them and talked over with no actual result. On June 7th he received a telegram from Mrs. Short stating she could give no extension without the consent of Short. On the same date he wrote a letter to Short, and another to Mrs. Short, stating that he had deposited in the bank at Grants Pass mortgages in the amount of $6,900 and suggested certain alleged defects in the title. The letter also offered to pay the sum of $2,175 cash on condition that the specified defects in the title should be removed. Before the commencement of this suit, plaintiffs caused these apparent defects in the title to be remedied, of which defendant Sherman was notified; but, instead of paying the money due, he requested plaintiffs' attorney to intercede with plaintiffs and see that more time was granted him, which plaintiffs declined to grant, and deposited a warranty deed to the property in the bank subject to his order upon paying the amount due under the contract. He paid nothing, and the suit was brought. The mortgages which he deposited in the bank were not such as were required by the contract, and were never approved by Mrs. Short; nor was she in any way consulted as to the tracts of land upon which they should be given; nor is there anything in the evidence indicating that she ever extended the time for performance of the contract beyond the mere fact that she did not sooner cause a suit to be brought to foreclose Sherman's right thereunder, if he had any. The contract being joint, neither party could extend the time without the consent of

the other.   The delay of plaintiffs for the purpose of correcting apparent defects in the title, which in fact were not real encumbrances but only apparent, probably extended the time for payment until these defects were obviated and the defendant notified of that fact, and the defendant's alleged tender was evidently made in bad faith and for the purpose of securing time, it being plain from the testimony here that he never had the money to make the tender good.   In fact, he admits that he had no money, but says that he had arranged to borrow it from his attorney.   His attorney was also a witness and did not attempt to corroborate this assertion.   The evidence shows that the defendant had against him, and still has against him, judgments which he is unable to pay, and his statements in this respect, like some others made by him in his testimony, cannot be accepted.   When written tender is made, a defendant must show that he had at the time, and still has, the means of making the tender good: *Ladd & Tilton* v. *Mason,* 10 Or. 308; *Holladay* v. *Holladay,* 13 Or. 523 (11 Pac. 260, 12 Pac. 821); *McCourt* v. *Johns,* 33 Or. 561 (53 Pac. 601).   The defendant has not made any such showing in this case.   To sum up, he has forfeited his option, and with it the sums paid by the power company upon it, and the plaintiffs ought not to be compelled to wait longer upon his attempts to retrieve himself by finding a purchaser for the property.

We think the decree of the Circuit Court allowing him to redeem by paying in cash the sums yet due was quite as favorable as the law or the facts in this case warranted.   However, we will give him a further opportunity by providing that he may redeem by paying the same sum with accrued interest within 90 days from the entry of the mandate of this court in the Circuit Court, said payments to include in addition the

costs and disbursements of this court; otherwise, the decree of the Circuit Court will be in all things affirmed.

Modified and Affirmed.