Argued June 28, affirmed September 5, petition for rehearing
denied October 8, 1963 . · .

## BEMBRIDGE ET UX *v.* MILLER ET AL,
## SHAFER ET UX
### 385 P. 2d 172

*William E. Dougherty,* Portland, argued the cause for appellants. On the brief were Dougherty & Cairns, Portland.

*George L. Hibbard,* Oregon City, argued the cause for respondents Bembridge. On the brief were Hibbard, Jacobs, Caldwell & Kincart, Oregon City.

Before McALLISTER, Chief Justice, and ROSSMAN, SLOAN, DENECKE and LUSK, Justices.

ROSSMAN, J.

This is an appeal by the defendant Fred C. Shafer from portions of a decree entered in a suit for declaratory relief filed by the plaintiffs William E. and Eva L. Bembridge, husband and wife, to determine the rights of the parties in a parcel of real property located near Oswego in Clackamas County.

The decree which was entered May 23, 1962, declared the plaintiffs (respondents) to be the owners of the real property subject to the right of defendant Fred C. Shafer to purchase the property for a price, specified in the decree, together with interest, and granted him a time certain within which to pay the price and receive the title or lose his equitable interest. Defendant Shafer appealed from the portion of the decree which awarded interest to the plaintiffs on the purchase price from the date the contract of sale was executed.

The property, about five acres in area, contains a two story dwelling and was purchased by the Bembridges sometime in 1942. Later, in anticipation of litigation concerning the purchase, the Bembridges conveyed the property to William H. Miller, father

of Plaintiff Eva L. Bembridge. The conveyance to Miller, who is since deceased, was without his knowledge. The plaintiffs alleged that Miller held the title in trust for them. The circuit court decreed that neither Miller's estate nor his heirs had any right, title or interest in the property.

The Bembridges and defendant Shafer became acquainted through the fact that they were neighbors during the time the Bembridges occupied this property. Mr. Bembridge and Mr. Shafer were attorneys, but neither was a general practitioner.

In 1953 the Bembridges moved to Seattle, Washington, where they remained until the end of 1961 or the first part of 1962. They leased this property for a monthly rental of $150 which was not paid. In the process of evicting the tenants and collecting the defaulted rent Mr. Bembridge entered into discussions with defendant Shafer relative to his purchase of the property.

During these discussions which occurred early in 1954, Shafer was informed by the plaintiffs that title to the property was in Mr. Miller as trustee and consequently the papers relative to the purchase of the property would have to be signed by him.

These discussions culminated in the execution of an earnest money receipt February 15, 1954, embodying a contract for the purchase of the property. The purchase price was $15,500 with $500 earnest money down payment. The net equity of the Bembridges in the purchase price after deduction of the down payment, a prior mortgage and a roofing obligation was $11,777.28. The contract provided:

> "This sale is contingent upon the purchaser obtaining a $12,400.00 FHA loan on the herein

described real estate sold hereby and if said contingency is not fulfilled, then the earnest money shall be refunded."

The earnest money receipt was drafted by defendant Shafer.

Possession of the property was given to Shafer with the execution of the earnest money receipt. Bembridge testified that possession was given for the limited purpose of having the building appraised so it could be mortgaged. He also testified he told Shafer: "* * * be sure you own it before you touch a nail in it."

March 5, 1954, defendant Shafer applied for a mortgage loan on the property from Prudential Insurance Company of America. The loan was to be insured by Federal Housing Administration (FHA). Subsequently, in April 1954, he was informed that the property did not qualify for FHA approval. Before it would insure the loan FHA required repairs which it did not specify. The physical condition of the property had become impaired by neglect and hard usage. Pursuant to his interpretation of the requirement for repair Shafer commenced renovation work on the house that ultimately cost $13,660.79. Included in the total expenditure were exterior painting, replacement of the front and back porches, installation of a bay window, interior painting, plastering, papering and the installation of cabinets, a sink and dishwasher in the kitchen. The expenditures covered work done in a period from February to September 1954.

May 23, 1954, Bembridge went from his home in Seattle to confer with Shafer because he was concerned over the delay in consummating the sale. He testified that he tendered a deed at that time to Shafer

and, receiving no payment, handed him a notice that the contract was rescinded. Shafer denied receiving the notice. A second notice was sent on June 25, 1954, by registered mail—this notice Shafer acknowledges. Following the rescission notice plaintiffs engaged a series of attorneys and instituted two law suits to regain possession of the property. The suits were dismissed without trial on the merits. October 4, 1955, the Bembridges impressed a fictitious mortgage on the property designed to defeat a threatened transfer of the property from Miller to Shafer. The lower court's decree declared this mortgage null and void.

Subsequent to the notice of rescission, Shafer dealt exclusively with Miller concerning the purchase of the property. September 1, 1954, defendant Shafer received an FHA compliance inspection report which stated briefly that the building improvements had been acceptably completed.

September 8, 1954, a significant date in this litigation, Shafer sent a letter to Miller with a copy to Bembridge's attorney in which he set out the improvements and repairs that had been made, and concluded:

"As the result of a great deal of trouble, as well as substantial expense, to me, the contingency of our contract on my part has now been met, and I have received a compliance inspection report showing that the building improvements have acceptably been completed.

"Accordingly, I now tender you full performance on my part of all of the remaining terms of our contract; and I expect performance on your part."

Either defendant Fred C. Shafer or defendant Virginia Shafer, from whom he is now divorced, has retained possession and occupied the premises in ques-

402

tion to the present date. This suit was instituted by the plaintiffs in September 1961.

Defendant Shafer's (Fred C. Shafer) sole assignment of error contends the lower court erred in decreeing the contract purchaser owes interest on the purchase price of the property from the date of the earnest money receipt (February 15, 1954) to the date of payment.

Appellant first argues that his letter of September 8, 1954, qualifies as a tender in writing pursuant to ORS 81.010 which provides:

> "An offer in writing to pay a particular sum of money or to deliver a written instrument or specific personal property is, if not accepted, equivalent to the actual production and tender of the money, instrument or property."

■■ At common law the term "tender" has definite legal significance imparting not merely the willingness and intent to perform but also the ability at the time of tender to pay in accordance with the offer. The thing tendered, whether money, documents or chattels, must actually be produced and made available for the acceptance and appropriation of the person to whom it is offered. In essence the only distinction between "tender" and payment lies in the fact that a "tender" is not accepted while a payment is. Consequently, if there is an offer to perform but no money is made available, there can be no payment; and likewise, there can be no tender—at best only a naked offer to pay. *Equitable Life Assur. Soc. v. Boothe,* 160 Or 679, 86 P2d 960; *Hartman v. Stark,* 99 Or 596, 195 P 1117.

■ The legal effect of "tender" at common law is to cut off the tenderer's liability, other than for the debt,

for damages and interest arising from nonpayment. This effect arises because the debtor has done all that is required of him and his liability should not be increased simply because the proferred sum is not accepted by the creditor. The offer has this effect only if it complies with the requirements of "tender." It must be an unconditional offer to pay the full amount of the debt and the money must be presently available for acceptance. 86 CJS, Tender, §§ 1, 2, 29, 30, 50; *Hartman v. Stark,* and *Equitable Life Assur. Soc. v. Boothe,* both supra.

■ Except as modified by statute, the common law definition of tender is still applicable in this state. *Equitable Life Assur. Soc. of U. S. v. Boothe,* 160 Or 679, 86 P2d 960. The legislature, in enacting ORS 81.010, did not intend to supersede the common law requirement that the person making the written tender have the present ability to make the tender good if it is accepted. *Holladay v. Holladay,* 13 Or 523; *McCourt v. Johns,* 33 Or 561, 53 P 601; *Milton v. Hare,* 130 Or 590, 280 P 511; *Eastern Ore Land Co. v. Moody,* 119 CCA 135, 198 F 7; *Short v. Rogue River Irr. Co.,* 82 Or 662, 162 P 845; *Ladd & Tilton v. Mason,* 10 Or 308.

*Holladay v. Holladay,* supra, involved a loan of approximately $160,000 plus interest. Respondent claimed, *inter alia,* that interest stopped on the note at the time a written offer of payment was made. This court rejected the contention and after quoting section 842 of Oregon Civil Code (ORS 81.010) continued:

"* * * It is a statute for convenience. It is a hardship to require a party who wants to pay off a debt or discharge an obligation, and the amount is large, to make an actual offer of it, and the legis-

lature has substituted another mode; but this does not dispense with the necessity of the parties [sic] having the money in fact, nor of his bringing it into court when the suit is begun, in order to keep his tender good. He would certainly have to do that to discharge the debt, or, under our statute, avoid the payment of costs, and I think it ought to be done in order to stop interest."

In *McCourt v. Johns,* supra, the vendee in a land contract sought to rescind, claiming he had tendered the agreed price in writing. This court held the written offer of payment was not a good tender since the vendee's testimony showed he was not prepared to make his tender good. The decision said:

"* * * The statute has provided that 'an offer in writing to pay a particular sum of money is, if not accepted, equivalent to an actual production and tender of the money'; but it was not the intention of the legislature thereby to dispense with the readiness and ability on the part of the one making the tender to pay in substantial accord with its terms. * * *"

*Milton v. Hare,* supra, ruled:

"It is not sufficient compliance with the statute to merely offer in writing to do a thing and then do nothing more."

*Eastern Ore Land Co. v. Moody,* supra, was a suit in equity by Moody for specific performance of a contract for sale of land. Moody was far in arrears on the contract and after a threat to foreclose wrote a letter to the seller saying he would pay the balance on the contract. This court rejected his purported tender saying:

"A tender of payment, to be the equivalent of an actual production and tender of the money, must be made by one who has the present ability to make the tender good, and the burden of proof

is upon the plaintiff [tenderer] to show that he has such ability."

From all that appears in the record, appellant (defendant) Shafer has not sustained this burden. Nowhere in the record is there any indication that an FHA approved mortgage was made on the property or that the proceeds of a loan were made available to Shafer. The FHA compliance report of September 1, 1954, was not a completed mortgage or loan but merely an FHA construction examiner's report stating the building improvements were acceptably completed. There is no indication Shafer followed up this report or that there was a final disposition of his loan application by Prudential Insurance Company. Consequently, on September 8, 1954, it appears Shafer was not able to make good the offer of full performance by an FHA approved loan.

The following is from Shafer's testimony:

"Q Did you have the money at that time, the $12,400?

"A I could have had it as soon as the Bembridge suit was dropped, so that I could borrow on the property, because it was the only source of funds, was to get a mortgage loan on the property and I had to have a clear title without a cloud so that I could borrow on it.

"Q Well, actually, this tender meant that you were willing to try to dig up the money to take care of your obligation under the contract and didn't at all mean that you were ready to fulfill the obligation as of September 8, 1954.

"A That was not my only source of funds. This is one way I possibly could have raised the money on the outside."

This uncontroverted evidence shows not only that

the loan was not made but also that it could not have been made on or before September 8, 1954.

■ Shafer's testimony indicates, disregarding the inconsistency, that a mortgage loan on the property was not his only available source of funds; he states he "possibly could have raised money on the outside." What his "outside" source was was not revealed. Nor did he indicate that funds from this "outside" source were available on September 8, 1954, so that he could apply them on this obligation if his offer of full performance was accepted. A mere assertion that the money to back up the offer was available to the appellant was not sufficient.

In *Short v. Rogue River Irr. Co.*, supra, this court rejected a purported written tender when the purchaser admittedly had no money even though he had made arrangements to borrow money from his attorney. The court reiterated the oft stated principle: "When written tender is made, a defendant must show that he had at the time, and still has, the means of making the tender good."

The conclusion seems inevitable that appellant Shafer did not have $11,777.28 to turn over to Mr. Miller or the Bembridges on September 8, 1954. Simply stating in the letter that he tendered full performance does not automatically impart to these words all the legal significance that flows from a valid tender. The requirement of a present ability to make good the offer is indispensable to give the offer the legal effect of a tender.

A holding would be strange if it ruled that a debtor who was presently unable to discharge the obligation could stop the running of interest simply by offering full performance in writing.

Appellant contends the Bembridges waived any objection to the purported tender by failing to object when it was made. He cites ORS 81.020. This statute provides:

"The person to whom a tender is made shall at that time specify any objection he may have to the money, instrument or property or he shall be deemed to have waived it; and if the objection is to the amount of money, the terms of the instrument or the amount or kind of property, he must specify the amount, terms or kind which he requires or be precluded from objecting afterwards."

■ Before a person to whom a tender is made can interpose an objection he must be apprised of the factors to which he can object. The ability of the tenderer to make good the tender is usually information peculiarly within his own knowledge. This is information with which the recipient of the offer should not be charged. Rarely would a creditor know whether his debtor was able to pay when he makes a tender of performance. If he is not apprised of this inability, he certainly could not object. How then can it be said he waives this particular objection? It is not the purpose of this statute, just as it is not the purpose of ORS 81.010, to raise a naked offer to the legal status of a tender when the offeror does not have the present ability to pay.

In the Oregon cases holding that objections to a tender are waived under ORS 81.020 the tenderer had in each case the present ability to make his offer of performance good. *Seidenberg v. Tautfest,* 155 Or 420, 64 P2d 534; *Hawkins v. Fuller,* 116 Or 433, 240 P 549; *Comstock Mfg. Co. v. Schiffmann,* 113 Or 677, 234 P 293; *Sayre v. Mohney,* 30 Or 238, 47 P 197. There is no authority for appellant's proposition that

an objection to the insufficiency of a tender on the ground of inability to pay is waived. On the contrary, the principle is clear that in order to establish such a waiver of objection the tenderer must show an existing capacity to perform. 62 CJ, Tender, § 44; 86 CJS, Tender, § 34; *Adams and McKee Land Co. v. Dugan,* 68 Cal App 226, 228 P 681; *Wynkoop v. Cowing,* 21 Ill 570; *Bonds v. Rhoads,* 203 Miss 440, 35 So2d 437; *Sovereign Camp W.O.W. v. McClure,* 176 Miss 536, 168 So 611; *Adams v. Adams,* 156 Neb 540, 57 NW2d 131; *Falk v. Springarn,* 279 NYS 282, 155 Misc 355.

Appellant argues that his liability for interest should be denied because of the Bembridges' conduct which he says frustrated completion of the contract. He apparently contends that because of respondents' litigation and the ficticious mortgage which impeded the consummation of the sale he should be allowed to enforce the contract, retain the fruits of possession and pay no interest on the purchase price, which as yet has apparently not been paid.

 The theory of equity in awarding interest on the purchase price in the specific enforcement of a contract for the sale of land is governed by the peculiar character of the relation between vendor and purchaser. A type of reciprocal fiduciary relationship is created by the agreement. The purchaser acquires an equitable interest in the land and the vendor an equitable interest in the unpaid purchase price. Absent any stipulation to the contrary, the purchaser has a right to possession or the rents and profits of the land and the vendor a right to interest on the unpaid purchase price. The fruits of possession and the interest are mutually exclusive—there is no right upon the part of either to have both. *Hoehler v. McGlinchy,* 20 Or 360; *Sayre v. Mohney,* 30 Or 238, 47 P 197; *Burkhart*

*v. Howard,* 14 Or 39; *Plews v. Samuel,* [1904] 1 Ch (Eng) 464; *Bangs v. Barret,* 16 RI 615, 18 A 250; *Barrowman v. Charles,* 234 Ky 508, 28 SW2d 780; *Lowther-Kaufman Oil & Coal Co. v. Gunnell,* 184 Ky 587, 212 SW 593; *Sale v. Swan,* 138 Va 198, 120 SE 870; *Pearce v. 3rd Ave Improv Co.,* 221 Ala 209, 128 So 396.

■ This court very early recognized the principle in *Hoehler v. McGlinchy,* supra. In finding the purchaser liable for the unpaid purchase price, the court said:

> "The record presents the case of a plaintiff as vendor who has delivered the possession of his property to the defendant as a purchaser at the time, or near thereto, when the original contract was made, which the defendant has continued to enjoy without molestation ever since. Nor is this all: he has not only received the rents and profits, but has also held the purchase money. It is not equity that he should keep both, nor according to the ordinary course of business transactions. Whatever labor he may have expended on the property was for his own benefit and to increase its value; and it sounds inequitable that he should enjoy the plaintiff's property during all this time for nothing. We think it is more equitable, after having been in the enjoyment of the estate, receiving its rents and profits, that the defendant should pay the interest."

The facts mentioned in that extensive quotation closely parallel those we are considering today. Appellant Shafer has had the fruits of possession of the property since February 1954, in excess of eight years. During this time he has paid a $500 down payment, a $386.76 roofing obligation, and has made monthly payments of $52 on a prior FHA mortgage of $3,023.95 on the property. All of these sums were deducted

from the purchase price of $15,500 to determine the balance of $11,777.28 due the Bembridges.

Mr. and Mrs. Bembridge testified that they had rented the property in the past for $150 per month and that they would at no time have rented it for less. During the eight year period the total rental value of the property would be roughly $14,000 while the interest on the unpaid purchase price of $11,777.28 at 6 per cent per annum would be roughly $5,600 for the same period.

■ Mr. Shafer has suffered no loss during the period of delay and has had the fruits of possession, in the words of *Hoehler v. McGlinchy,* "for nothing." The ill advised conduct of the Bembridges stemming from what they believed to be a rescission of the contract is not sufficiently reprehensible to deny them interest. In the absence of some gross inequity, it seems to be the predominant weight of judicial opinion in courts of equitable jurisdiction that to accord the purchaser beneficial enjoyment of possession without liability for interest on the detained purchase money is inequitable.

Appellant also contends he should not be liable for interest prior to September 8, 1954, because his performance was not due until then. At law in the absence of a contractual provision to the contrary, the vendor's right to the purchase money would not mature until the time for the purchaser's performance had arrived. Consequently, interest would be calculated only from the date of the vendee's default.

Equity, however, when asked to enforce the performance of an agreement of this character, proceeds not only with a recognition of the contractual rights of the parties, but also with an observance of the

position assumed toward each other by the parties during the period of the contract and the resultant equities. And as mentioned above, in equity we ascribe significance to the fact of immediate possession of the property by the purchaser. There is nothing incompatible with equity in the lower court's decree awarding interest from the date of the earnest money receipt (February 15, 1954) until the purchase money is paid.

The decree of the circuit court is affirmed.