# D. M. DEVELOPMENT COMPANY,
### *Respondent - Cross-Appellant,*
*v.*
## OSBURN et al,
### *Appellants - Cross-Respondents.*
## (No. A7712-17290, CA 14411)
621 P2d 1186

Michael E. Kohlhoff, Wilsonville, argued the cause for appellants - cross-respondents. With him on the briefs was Kohlhoff & Moen, Wilsonville.

Michael S. Fryar, Gresham, argued the cause and filed the brief for respondent - cross-appellant.

Before Richardson, Presiding Judge, and Thornton and Buttler, Judges.

THORNTON, J.

## THORNTON, J.

Defendants appeal from a decree of specific performance which compels them to sell business property to plaintiff on terms specified in a lease agreement. Defendants assign as error the following:

1)　Failure to hold that plaintiff was in default on the lease and thus had no right to enforce any provision thereof;

2)　Failure to hold that the terms of the lease were superseded by a settlement agreement which was either authorized by plaintiff or subsequently ratified;

3)　Holding that the $45,000 purchase price specified in the lease was subject to an offset of $4,900 for payments received from Multnomah County in an eminent domain proceeding; and

4)　Failure to award interest on the purchase price from the date plaintiff attempted to exercise the option to purchase.

Plaintiff cross-appeals from the refusal of the trial court to reopen the decree and take evidence on its claim for damages for breach of an implied covenant of quiet enjoyment. The court held that plaintiff had waived its right to offer evidence on that claim. Plaintiff further contends that the court erred in failing to award plaintiff the full $10,000 in attorney fees it requested.

The essential facts are somewhat involved: Plaintiff is a closely-held corporation, owned by its president, Casterline. Defendants Leonard Osburn and Gwendola Osburn Pearson are former husband and wife and joint owners of the property in question. In 1962, plaintiff and defendants entered into a five-year lease of a commercial property which plaintiff in turn subleased to a lumber company owned and operated by a friend of Casterline's. Rental was fixed at $200 per month with defendants to pay taxes, and the lease gave plaintiff a right to renew for an additional ten-year period.[1] In September, 1967, plaintiff

---

[1] The clause provided:

"Lessee shall have the option or privilege of renewing this lease for a period of ten years upon the same terms and conditions herein granted except that, if the real property taxes shall be increased over and above the 1962-63 taxes, then the *rental for the additional ten year period shall be increased pro rata to the increase in taxes.* * * *" (Emphasis supplied.)

renewed the lease, to run from December 1, 1967, to November 30, 1977.

In February, 1968, a dispute arose over the amount of increased rent owing under the clause which provided for rent to increase "pro rata to the increase in taxes" over the 1962-63 level. The controversy was referred to the attorney who drafted the document and he stated that plaintiff's interpretation was correct. Thereafter, no further mention was made of the disagreement until December 11, 1974, when Mr. Osburn's attorney wrote to plaintiff, resurrecting the controversy and demanding unpaid back rent based on defendants' interpretation of the lease provision. During the intervening period, rent had been paid in amounts consistent with plaintiff's interpretation and all payments were accepted without comment.[2] In the spring of 1975, when plaintiff refused to pay back rent as demanded, defendants brought an FED action. The action was continued at plaintiff's request.

About this time (late 1974--early 1975), the defendants were involved in dissolution of marriage proceedings and plaintiff was directed to make rent payments directly to Mrs. Osburn. She failed to make tax payments to Multnomah County and, when plaintiff discovered this fact, it notified defendants (by letter dated October 7, 1975) that it would thereafter make tax payments directly to the county. In the same letter, plaintiff offered to purchase the property prior to expiration of the lease for the price fixed in the lease ($45,000) but on more favorable terms (higher downpayment, monthly payments and interest rate). This offer was rejected.

After continuance of the FED action, settlement negotiations were undertaken. On June 22, 1976, a meeting between all the parties and their attorneys was held in the office of plaintiff's attorney. Mrs. Osburn, who had received the property as part of the dissolution, demanded $60,000 "net" in settlement. Plaintiff offered only $50,000. The meeting terminated with no agreement.

---

[2] There was no allegation of waiver or estoppel. At the close of all the evidence, plaintiff moved to amend its complaint to include such an allegation with respect to rent payments accepted, which was denied. The denial is not assigned as error.

On July 16, 1976, Mr. Osburn's attorney sent a letter to plaintiff which stated in part:

"I received a telephone call from Mrs. Osburn's son * * * advising that settlement in the sum of $50,000 was not acceptable, but that his mother would accept $55,000 [with certain terms]. * * * *"

The letter informed plaintiff that trial of the FED action had been set over for the last time and that the parties had better settle by the end of August or be prepared to try the case.

Between July 16 and August 13, 1976, plaintiff's attorney carried on further discussions with Mr. Osburn's attorney. The essence of these discussions and the nature of the agreement that was apparently reached is in sharp dispute. Negotiations began with the parties $5,000 apart in their most recent figures. Somehow, the difference was split and a figure of $52,500 was arrived at. Under defendants' interpretation of the settlement, however, plaintiff was to pay off the tax liens in addition to the $52,500. This belief is reflected in Mr. Osburn's attorney's testimony and the August 3, 1976, letter from Mrs. Osburn's attorney which stated in part:

"My client will accept $52,500 *cash net* to settle, pursuant to the offer you transmitted to [Mr. Osburn's attorney], which I relayed to my client on this date.
"* * * * *
I will assume for all intents and purposes that the matter will now be settled." (Emphasis supplied.)

Plaintiff denies it ever agreed to pay taxes in addition to the $52,500. In any event, the misunderstanding was perpetuated by plaintiff's attorney's letter of August 9, 1976, stating:

"Receipt of your letter of August 3, 1976 is acknowledged. * * * From my conversation with [Mr. Osburn's attorney] just prior to his departure for vacation, I am also of the assumption that this figure is acceptable to Mr. Osburn and I have therefore advised my clients that the pending case [the FED action] is settled."

Following this exchange of correspondence, closing of the sale was delayed while defendants were attempting to resolve certain difficulties with respect to their property division and negotiations continued concerning the structuring of mortgage payments to consummate the

settlement. On March 4, 1977, Mr. Osburn's attorney advised plaintiff by letter that, although the Osburns had not entirely resolved their dispute, they agreed that the sale should be completed. On June 13, 1977, plaintiff mailed a check for $12,500, together with a note and mortgage for the remaining $40,000 and escrow instructions, to Mr. Osburn's attorney, who was to act as escrow agent. The instructions directed that back taxes and any other judgment against the property be paid from the amount tendered and that, upon execution of a warranty deed, the balance be disbursed to defendants. Several weeks later, plaintiff was informed that defendants expected plaintiff to pay taxes.

During this entire period, plaintiff continued to make rental payments to defendants and pay taxes to the county.[3] In September, 1977, plaintiff ceased paying rent because, upon formation of the original lease in 1962, plaintiff had paid $800 to cover rent due during the last four months of the lease term, which was to expire on November 30, 1977. It continued to make tax payments. On October 11, 1977, defendants notified plaintiff that it was in default on the lease and threatened termination unless default was cured within 15 days. On October 20, 1977, plaintiff replied that, if the sale pursuant to settlement did not close before November 1, 1977, on the terms set forth in the escrow instructions, the settlement was cancelled and plaintiff would exercise its option to purchase.[4] Plaintiff tendered funds from the $12,500 held in escrow to meet the $5,000 down-payment required by the lease for exercise of the option and to satisfy any other obligations. No agreement was reached and this suit followed.

■ The suit for specific performance included a paragraph alleging that defendants had breached the covenant of quiet enjoyment implied in the lease.[5] Plaintiff also sought attorney fees pursuant to the lease and tendered

---

[3] Casterline testified that plaintiff also paid off a portion of the delinquent taxes, but this amount is not in evidence.

[4] The lease specified that the option to purchase could be exercised at any time during the course of the lease.

[5] Inclusion of a claim for breach of covenant of quiet enjoyment in pleading a cause of suit for specific performance is clearly improper, but no motion to strike or demurrer was filed.

into court the $5,000 required as down payment. By affirmative defense, defendants allege that plaintiff violated the terms of the lease by failing to pay rent in accordance with defendants' interpretation, that it was in default when it attempted to exercise the purchase option and that a valid settlement of the FED action had been made which superseded the option to purchase contained in the lease. Defendants also counterclaimed for the reasonable rental of the property from November 1, 1977, and he for attorney fees.

Prior to trial, defendants requested and were granted a jury trial on their legal counterclaims. Defendants suggested that the trial be bifurcated with trial to the court to be held first "on the equitable issues as raised on the Plaintiff's Complaint for specific performance and our Answer and affirmative defenses * * *." The court then stated:

> "The Defendant has requested a jury trial on the issues of law, if any, which would remain after the determination of the equitable matters, and the Court has ruled that the Defendant may have such a jury trial. But, in order to accomplish that, the trial would need to be bifurcated; and, at this trial, *we will simply proceed with the suit in equity for specific performance and determine that issue only in this proceeding.*

> "If there are legal issues remaining after the determination of that issue, then that matter may be rescheduled for a jury trial at a later date." (Emphasis supplied.)

Trial on the specific performance claim followed. The trial court found that plaintiff's interpretation of the rents owed under the lease was correct and that plaintiff was therefore never in default. It further found that no valid settlement had been entered into and ordered specific performance:

> "The contract shall provide for the sale of the above property for the agreed price of $45,000.00, less the sum of $4,900.00 previously paid to defendants in eminent domain proceedings concerning the north ten feet of such property, and less the sum of $1,800.00 as delinquent taxes, or a purchase price of $38,300.00 to be paid as follows: [$5,000 down, balance in monthly installments of not less than $250 per month with 6 percent interest on the unpaid balance]."

The decree does not state from what date the interest is to run. The court also ordered defendants to pay $7,500 in attorney fees pursuant to a lease provision. Plaintiff moved to reopen the case to permit it to offer evidence of damages for breach of the covenant of quiet enjoyment. The trial court denied the motion.[6]

We address first the question of whether the parties entered into a settlement of the FED action which supersedes the lease option to purchase. The trial court held that plaintiff's attorney had no actual or apparent authority to commit plaintiff to pay delinquent taxes in addition to the $52,500 purchase price. We believe, however, that, regardless of plaintiff's attorney's authority to enter into such a contract, the evidence fails to demonstrate that there was ever a meeting of the minds on the question of delinquent taxes. *Steel Products Co. v. FMD Corp.,* 282 Or 513, 518-19, 579 P2d 855 (1978).

■ The respective testimony of the parties and their attorneys as to what occurred at the June 22, 1976, meeting and during the negotiations which followed is equally firm and unequivocal and supports the positions advanced by each side on this appeal. There is, however, no objective basis in the record for us to conclude that one side is more justified in its interpretation of what was agreed to than the other. The August 3, 1976, letter from Mrs. Osburn's attorney did not clarify the situation inasmuch as his statement that his client would "accept $52,500 cash net" did not designate whether the figure represented "cash net to Mrs. Osburn" or "cash net from plaintiff." At best, the evidence shows that a misunderstanding arose as to the meaning of the term "cash net" and became imbedded in the assumptions of the parties. The offer of $52,500 meant something different to each party and, therefore, no actual agreement on the purchase price was reached. Plaintiff's subsequent attempt to consummate the transaction as understood from the negotiations and correspondence did

---

[6] Plaintiff made an offer of proof with respect to damages which is not in the record and which the trial court refused to consider. The court's opinion states by way of dictum that it would regard such evidence as inconclusive in any event. No offer of proof was required, however (see ORS 18.160), and we treat the situation as if the court had simply denied the motion to reopen the judgment.

not amount to agreement or ratification as contended by defendants. Upon being specifically apprised of the erroneous understanding, plaintiff asserted its disagreement.

■   Next, we agree with the trial court that the evidence preponderates in favor of a finding that plaintiff's interpretation of the amount of rent payable under the lease is correct. The lease provided that, upon renewal, "rental for the additional ten year period shall be increased pro rata to the increase in taxes." The meaning of "pro rata" in this context is far from clear. Defendants urge that it means "in proportion to"; therefore, since the 1967-68 taxes were 34 percent higher than the 1962-63 base year, they argue that rent should also increase 34 percent, to $269 per month. Plaintiff contends that the term means that the net increase in taxes should be "pro-rated over twelve months." In this case, "pro rata" could also mean that the rent should be redetermined each year of the ten-year lease rather than once at the beginning of the renewal term. We conclude that the clause is ambiguous and extrinsic evidence was admissible to elucidate the intent of the parties. ORS 41.740, 42.240.[7]

■   The testimony of the parties was directly contradictory on this point. Mr. Osburn testified that he asked the attorney who drafted the document whether his interpretation was correct and was told that it was. This testimony was specifically denied by the attorney himself who testified that plaintiff's interpretation was intended. Although the drafting attorney was hired through contact

---

[7] ORS 41.740:

"When the terms of an agreement have been reduced to writing by the parties, it is to be considered as containing all those terms, and therefore there can be, between the parties and their representatives or successors in interest, no evidence of the terms of the agreement, other than the contents of the writing, except where a mistake or imperfection of the writing is put in issue by the pleadings or where the validity of the agreement is the fact in dispute. However this section does not exclude other evidence of the circumstances under which the agreement was made, or to which it relates, as defined in ORS 42.220, or to explain an ambiguity, intrinsic or extrinsic, or to establish illegality or fraud. The term 'agreement' includes deeds and wills as well as contracts between parties."

ORS 42.240 states in part:

"In the construction of an instrument the intention of the parties is to be pursued if possible * * *."

with one of plaintiff's employes, we do not believe that the connection is significant enough to discredit the attorney's testimony. To the extent resolution of the question turns on the credibility of the parties' testimony, we defer to the trial court which observed the witnesses. *North Pacific Lumber Co. v. Oliver,* 286 Or 639, 596 P2d 931 (1979).

Defendants argue that, even if plaintiff's interpretation of the meaning of "pro rata" is correct, evidence presented (mainly on motion for reconsideration which was allowed by the trial court) established that plaintiff was in default at the time of the attempted exercise of the option. According to defendants' evidence, plaintiff was $144.14 behind in rent on November 1, 1977. Plaintiff, however, had at least $200 credit toward rent remaining from the $800 paid when the original lease was signed for which it was entitled to credit if the option were exercised before expiration of the lease term. In light of this fact, and the confused state of the parties' accounts stemming from Mrs. Osburn's wrongful withholding of money paid by plaintiff as rent to cover the increase in taxes, we believe defendants have failed to prove that plaintiff was in default.

■    The trial court ordered an offset ($4,900) against the purchase price for money paid to defendants for part of the property taken in eminent domain proceedings. The testimony of Mr. Osburn's attorney shows, however, that the $4,900 figure is a composite of $1,400 paid in eminent domain proceedings, $800 in prepaid rent and $2,700 in back taxes and was the amount requested in offset by plaintiff at the June 22, 1976, meeting. Plaintiff should receive credit for $1,400 plus whatever amount remained from the prepaid rent as of November 1, 1977.

Under the decree plaintiff is required to pay off the tax lien and the trial court credited $1,800 for such payment against the purchase price. The $1,800 figure, according to the trial court, is the amount judicially admitted by the parties. We are unable to find any such admission in the record. As noted, the figure of $2,700 was attributed to back taxes during settlement negotiations. Plaintiff's attorney mentioned $2,200. The title insurance policy, dated September 9, 1976, reports tax liens for the years 1974-76 amounting to $2,905.67 plus interest. We remand the case

for a determination of the precise amount of the set-off and interest.

■ Finally, defendants contend the trial court erred in failing to award interest on the contract and decree payments from November 1, 1977. They cite *Bembridge v. Miller,* 235 Or 396, 385 P2d 172 (1963), in which the court ordered a purchaser, who had been in possession of the real property for eight years during which he made no rent or contract payments, to pay interest on the unpaid amount of contract dating from the time the agreement was signed.

> " * * * Absent any stipulation to the contrary, the purchaser has a right to possession or the rents and profits of the land and the vendor a right to interest on the unpaid purchase price. The fruits of possession and the interest are mutually exclusive--there is no right upon the part of either to have both. * * *
>
> " * * * * * *
>
> " * * * In the absence of some gross inequity, it seems to be the predominant weight of judicial opinion in courts of equitable jurisdiction that to accord the purchaser beneficial enjoyment of possession without liability for interest on the detained purchase money is inequitable." 235 Or at 408-10.

Although the facts in *Bembridge* were different, we believe that the rule applied there also applies here. Since we are enforcing the original contract, defendants are entitled, as of the date of the mandate, to payment of those installments and interest as they would have accrued had payments been made regularly since November 1, 1977. Defendants are not entitled to interest on the $5,000 actually tendered.

■ Plaintiff argues on cross-appeal that the trial court erred in depriving it of an opportunity to present evidence on its claim for damages for disruption of the "quiet enjoyment" of its leasehold. A covenant of quiet enjoyment is generally implied in a lease as a matter of law. *Northern Brewery Co. v. Princess Hotel,* 78 Or 453, 462, 153 P 37 (1915); 49 Am Jur 2d Landlord and Tenant § 330 (1970). Whether this covenant is breached presents an issue of law. Plaintiff stated it did not want a jury trial on this damage claim. In this posture, it would clearly have been be more efficient to have tried that claim with the suit for specific

performance. Defendants, however, requested a jury trial on their legal counterclaims for reasonable rent and attorney fees. There is evidence that plaintiff understood defendants wanted a jury trial on *all* damage issues and that impression was reinforced by the language of the trial court quoted above. Either party to a lawsuit may request a jury trial. Former ORS 17.033; Oregon Rules of Civil Procedure 50; *Carey v. Hays,* 243 Or 73, 76, 409 P2d 899 (1966). We believe plaintiff was misled into not offering proof on its claim for breach of the covenant of quiet enjoyment and we remand the case for the taking of evidence on this claim.

■■ Plaintiff was awarded $7,500 of the $10,000 in attorney fees it requested. The amount of attorney fees is a question of fact over which the trial court has wide discretion. *Garrison v. Cook,* 280 Or 205, 212-13, 570 P2d 646 (1977). There was evidence that plaintiff's requested fees included some duplication of time between its two attorneys and charges for time spent in attempting to resolve the FED action.[8] We conclude that the $7,500 award was adequate.

To summarize, the decree of specific performance of the contract at the $45,000 purchase price is affirmed subject to offsets for the eminent domain proceeds, the remaining amount of prepaid rent and the tax liens plus interest which plaintiff is required to discharge. On remand, the court will hear evidence relating to the claim for breach of the covenant of quiet enjoyment, and on the tax and interest aspects of the decree. In all other respects, the decree is affirmed.

Affirmed in part; modified in part; reversed and remanded in part.

---

[8] The lease provided:

"In the event suit or action shall be instituted to enforce any of the terms and provisions of this agreement, the prevailing party shall be entitled to judgment for attorneys fees in such an amount as the court may deem reasonable."